UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WANDA SHORT, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | CIVIL NO.   3:02CV827 (MRK) |
| | : | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION

In this action, plaintiff Wanda Short sues defendant UNUM Life Insurance Company of America ("UNUM") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), claiming that UNUM wrongly discontinued her long-term disability benefits under a group long-term disability insurance policy that UNUM issued to her employer.  Plaintiff had been receiving disability payments from UNUM for approximately three years as a result of symptoms related to Systemic Lupus Erythematosus ("lupus").  After continued improvement over an extended period of time, UNUM determined that plaintiff's condition had improved sufficiently to enable her to perform full-time sedentary work of a kind for which she was reasonably fitted by education, training or experience.  While acknowledging that her lupus difficulties had resolved, plaintiff nonetheless challenged UNUM's disability determination through UNUM's administrative processes on the ground that she had developed a medical condition known as fibromyalgia, which prevented her from performing full-time sedentary work.  After exhausting her administrative remedies, plaintiff brought this action, claiming that UNUM's decision to deny her long-term disability benefits was arbitrary and capricious.  Both

parties now move for summary judgment. Finding no genuine issue of material fact, the Court GRANTS UNUM's Motion for Summary Judgment [doc. # 19] and DENIES Plaintiff's Motion for Summary Judgment [doc. # 14].

I.

As both parties agree, the facts in this case relating to plaintiff's disability claim are not in dispute. Those facts are set forth in a lengthy administrative record ("AR"), which this Court has reviewed in connection with the pending motions. Plaintiff has a masters degree in civil engineering. She was employed as a senior structural engineer for approximately 10 years at the Electric Boat Division of General Dynamics before joining Analysis & Technology, Inc., f/k/a Anteon Corporation ("A&T") as a Senior Engineer in April 1994. In her position with A&T, plaintiff performed engineering analyses of certain structures. Both parties agree that plaintiff's duties at A&T were sedentary in nature, though they required substantial cognitive functioning.[1]

Plaintiff was a beneficiary of the long-term disability policy that UNUM had issued to A&T. Under the UNUM policy, a claimant is disabled when she is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury," and

---

[1] A outside vocational review of plaintiff's occupation was conducted by Deede Delay, Ph.D. in which she concluded that the physical demands of an acoustical and technology senior engineer were sedentary. AR 369. Moreover, Charles N. Corrado, Senior Corporate Scientist at A&T and supervisor to plaintiff, submitted a profile of plaintiff's position on November 10, 1998 in connection with her initial request for long-term disability. It indicates that written and verbal communication and reasoning skills were either "frequently" (34-66% of the time) or "continuously" (67-100% of the time) required. As for physical activity, the senior engineer would "frequently" sit, and "occasionally" (up to 33% of the time) walk, balance, kneel or crouch. AR 392.

she has a "20% or more loss in [her] indexed monthly earnings due to the same condition."[2] AR 89.  The policy also provides that after 36 months of payments, a claimant is disabled "when UNUM determines that due to the same condition or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."  *Id*.  "Regular occupation" means "the occupation you are routinely performing when your disability begins"; "gainful occupation" is defined as "an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."  *Id*.

On December 1, 1998, plaintiff filed a claim for long-term disability benefits under the UNUM policy.  Plaintiff stated that she was disabled as of August 29, 1998 because she was suffering from Systemic Lupus Erythematosus with cognitive reductions and impairments.  AR 831.  Along with her claim, plaintiff submitted a report from her physician Robert E. Levin, M.D., a rheumatologist, who stated that plaintiff's lupus had caused her to suffer memory loss and reduced concentration.  Dr. Levin further stated that plaintiff needed to be in a less stressful environment and that her work week needed to be decreased to 30 hours per week; according to Dr. Levin, no prognosis was possible without completion of a neurological exam.  AR 833-34.  Plaintiff also submitted a neurological evaluation from Christopher C. Tolsdorf, Ph.D., in support of her disability claim.  According to Dr. Tolsdorf, Plaintiff was "showing modest, though not yet significant, memory decline, sporadic signs of mental slowing, significantly reduced mental flexibility and sustained concentration, and intact language and perceptual organizational skills,"

---

[2]"Limited" means "what you cannot or are unable to do"; "material and substantial duties" are duties that "are normally required for the performance of your regular occupation and cannot by reasonably omitted or modified."  "Sickness" means "an illness or disease."  AR 89.

which Dr. Tolsdorf attributed to plaintiff's lupus. AR 781. Dr. Tolsdorf's report stated, "In terms of work, I do not believe that she is currently disabled, but she may need continued reduced responsibilities are [sic] work as we monitor how things progress." AR 782.

In a January 30, 1999 evaluation of plaintiff, Dr. Levin opined that plaintiff had the daily ability to perform 6 hours of sedentary activity and 2-4 hours of light activity. According to Dr. Levin, "Patient should be back to usual function by early May," although until her memory problems resolved, Dr. Levin believed that plaintiff should limit her work to part-time, which plaintiff in fact did in this period. AR 747; 750. On April 2, 1999, Dr. Levin sent a note to UNUM in which he said that plaintiff was limited to less than 30 hours per week. "My prognosis for her is 'guarded,'" he reported, "as lupus patients are generally unpredictable. As to when she may return to work full-time, I have no idea at this time. I believe that part-time work within restrictions noted above is as much of a prognosis as I can give." AR 720. Though plaintiff tried to return to work part-time during this period, she was unable to do so.

On May 3, 1999, UNUM – applying the initial "regular occupation" standard to plaintiff's claim – informed plaintiff that it had granted her application for long-term disability, with the first date of disability being July 25, 1998. During the next approximately three years, plaintiff did not work, even part-time, and continued to receive disability payments under the UNUM policy. Plaintiff also continued to be treated for her symptoms and to provide UNUM with reports from herself and her physicians regarding her condition. According to these reports, plaintiff's condition appeared to improve considerably, particularly her lupus and the mental impairment that had previously been observed and was considered associated with her lupus. For example, in February 2000, Dr. Levin estimated that plaintiff now had the capacity to work 6

4

hours per day of sedentary activity.[3]  AR 602.  In a November 2000 telephone call with UNUM, plaintiff stated that she was "Feeling ok – feels like has leveled out." AR 522-26.  Plaintiff reported that she was doing volunteer work for her church 3-4 times per week, though she also stated that she still took naps during the day and felt fatigue, and also stated that she had "[t]hought about going back to work.  Would like to work her job can't go back to work until can work consistently."  *Id*.  Dr. Levin provided UNUM with a January 2001 update in which he opined that plaintiff now had 5 hours per day of sedentary activity capacity, 3 hours of light and 1 hour of medium activity capacity."  AR 481.  "Medium activity" was defined in the report as "50 pounds of maximum lifting with frequent lifting/carrying of up to 25 pounds.  Frequent standing or walking."  *Id*.

On January 31, 2001, plaintiff requested continued long-term disability benefits beyond the initial 36-month period that would conclude in November 2001.  In her letter, plaintiff stated, among other things, "Bottom line: I do need continued support from UNUM Long-Term Disability.  This illness has leveled to a point of inability to work at a job due to inability to predict times frequency for inoperative moments (rest/dysfunction) due to Lupus."  AR 469  On May 29, 2001, a physical therapist and an UNUM physician conducted a medical review of plaintiff's file in anticipation of the impending close of the initial 36-month "regular occupation" disability period.  They noted that according to Dr. Levin's January 2001 update, plaintiff was able to perform more than 8 hours of work per day.  AR 465

---

[3] In December 2000, the Social Security Administration denied Plaintiff's application for social security benefits, stating that "[a]lthough you have some memory problems, evidence shows that you are able to think, communicate, act in your own interest, and care for your own needs."  AR 506

In May 2001, plaintiff underwent a neurological examination with Dr. Tolsdorf, who issued a lengthy report, in which he concluded as follows:

> **In sum** she has shown positive improvements in all previously impaired areas of cognitive functioning involving mental speed, memory, executive functioning and fine motor speed. Her cognitive profile now falls essentially within normal limits with no areas of significant impairment. Her personality test, however, does not reflect any improvement and she continues to report significant somatic complaints, reduced energy, and mental dulling, but *her neurocognitive profile can now be considered within normal limits*. Her reports of reduced concentration at work probably represent factors other than loss of functional brain integrity, such as pain, stress or depression. . . . At this point, I would not recommend any further diagnostic tests or therapies.

AR 449-50.

In late September, Dr. Levin responded to an UNUM inquiry regarding plaintiff's condition. AR 431-32. Significantly, Dr. Levin stated in his late September report to UNUM that plaintiff's Lupus "ha[d] resolved." However, for the first time in any of his reports, Dr. Levin observed that plaintiff "now has classic fibromyalgia along with a degree of depression." Nonetheless, Dr. Levin opined that plaintiff "*now has full-time sedentary capacity*. I do not feel she has full-time light capacity. She still has some restrictions but I would try to avoid the physical demands," and "avoid strenuous physical activity and try to have her work in a less emotionally stressful work environment." AR 431 (emphasis added). Later in the same report, however, Dr. Levin stated that he had "not yet formulated [a return to work plan] for her as the fibromyalgia is a new diagnosis and I need to see how [she] respon[ds] to treatment." According to Dr. Levin, "her CNS Lupus prognosis is now good. . . . Her fibromyalgia prognosis is fair."

In October 2001, UNUM had plaintiff's file reviewed by an outside vocational consultant (Deede DeLay, Ph.D.) Dr. Delay's report to UNUM stated, in pertinent part:

> The medical review in a letter from Dr. Levin, AP [Attending Physician] support full-

6

> time sedentary work capacity. The employer's description of physical demands and duties are consistent with sedentary work demands. Based on a comparison of physical demands provided by her employer with physical abilities in the medical review, Ms. Short can perform the duties of her occupation as a senior engineer.
>
> In a 11/28/00 call, the claimant indicated that she was doing volunteer work at her church 3-4 days per week and at her office helping with paperwork. At that time, Ms. Short stated that she could return to work on a part-time basis is [sic] able to work on a regular schedule.

AR 369. Because she concluded that plaintiff could perform the duties of her regular occupation at A&T, Dr. Delay found it unnecessary to analyze whether plaintiff could perform any gainful occupation for which she was reasonably fitted by education, training and experience. *Id*.

On November 15, 2001, UNUM notified plaintiff that it was discontinuing her long-term disability benefits. In its letter to plaintiff, UNUM cited Dr. Delay's vocational assessment, Dr. Levin's office notes documenting continued improvement from 1999 through November 2001 and his September 2001 conclusion that her Lupus had resolved and that she possessed full-time sedentary capacity. UNUM also cited Dr. Tolsdorf's neuropsychological testing and her improvements in memory, perceptual organization and executive skills. The letter went on to note Dr. Levin's September 2001 observation that plaintiff now showed signs of fibromyalgia, but stated that having reviewed her file, UNUM's medical department "concluded that Dr. Levin's assessment that you would have the capacity to perform a sedentary occupation on a full time basis is supported by the medical information." AR 343-44.

After receiving UNUM's letter, plaintiff asked UNUM to review its decision denying her benefits, and UNUM did so. UNUM spoke with Dr. Levin and also reviewed a December 12, 2001 letter from Dr. Levin to UNUM. In the course of the telephone conversation, Dr. Levin reported that plaintiff's lupus was now "all normal" and most of her problems were now related

7

to fibromyalgia. AR 327. Dr. Levin indicated in his December 2001 letter that the fibromyalgia "limits her to two hours of sedentary work at a time followed by one hour of rest. This would make for a very 'broken' up workday." AR 309.

UNUM also had a physician, Dr. Barry Gendron, review Dr. Levin's letter and plaintiff's entire file. However, Dr. Gendron did not examine plaintiff and UNUM did not send plaintiff for an independent medical examination. Nonetheless, after reviewing plaintiff's history of continued improvement and the change in Dr. Levin's opinion from September 2001 (when he stated that plaintiff had full-time sedentary work capacity) to December 2001 (when he opined that plaintiff could only work for 2 hours at a time), Dr. Gendron reported to UNUM as follows:

> In short, I find no credible or consistent subjective complaints documented in the file from claimant which would support Dr. Levin's assertion that she could only work for 2 hours, then lie down and work for another 2 hours. In my opinion, this restriction is not supported medically. Although individuals with fibromyalgia are encouraged to change position, this typically is easily accommodated in sedentary vocations without the need to lie down.
>
> I question the credibility of Dr. Levin who has provided Wanda Short with progressively increasing restrictions when in fact her medical condition (for both the lupus and the fibromyalgia) have been documented to be improved.

AR 307. In sum, Dr. Gendron concluded that Plaintiff "may work full time in a sedentary occupation." *Id*.

On January 28, 2002 UNUM notified plaintiff that it had completed its review of the file and determined that the denial of long-term disability benefits was appropriate and that she was no longer considered disabled from performing the duties of any gainful employment for which she was reasonably fitted by training education or experience. UNUM's January 2001 letter once again cited plaintiff's continued improvement from 1999-2000 and Dr. Levin's assessments,

8

including his September 2001 conclusion that she had full-time sedentary work capacity. While noting Dr. Levin's diagnosis of fibromyalgia, the letter stated that "the majority of individuals with the condition of fibromyalgia are able to perform full time sedentary or light work." In addition, the letter noted information in plaintiff's file indicating that she was performing volunteer work for her church. The letter further stated that "[o]ur Medical Consultant concluded that there is no basis for Dr. Levin's conclusion that you could work only for 2 hours and then would need to lie down and then work another two hours." AR 299-302.

In March 2002, plaintiff, through her attorney, asked UNUM to reconsider its decision once again and plaintiff provided a personal statement regarding her condition as well as further medical documentation, including the entire medical file of Caryn Nesbitt, M.D., plaintiff's internist, and Paul Greif, M.D., a pulmonologist. UNUM asked Donna J. Carr, M.D., Vice President - Associate Medical Director of UNUM, to conduct another medical review of plaintiff's file including the newly submitted information. Dr. Carr noted that Dr. Nesbitt had noted symptoms suggestive of fibromyalgia as early as 1998, though she apparently had never conducted the so-called "tenderpoint" exam recommended by the American College of Rheumatology. According to Dr. Carr, whose medical specialty is family practice, "[t]he most recent restrictions and limitations provided by Dr. Levin are overly restricted and not credible, as the insured reports capacity consistent with sedentary to light activity . . . There is no evidence in the complete medical record to support impairment from fibromyalgia, and the new information does not, at any time, support impairment from fibromyalgia." AR 153-54.

As a result, UNUM informed plaintiff in an April 2002 letter detailing the history of her claim, that its renewed review had yielded the same conclusion, and that plaintiff had officially

9

exhausted her administrative remedies. AR 150. Thereafter, plaintiff timely filed this action under 29 U.S.C. § 1132(a)(1)(B).

II.

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to interpret the plan. *See Sullivan v. LTV Aerospace and Def. Co.*, 82 F.3d 1251, 1254 (2d Cir. 1996) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When the benefit plan grants the administrator such discretionary authority, a court ordinarily reviews the administrator's decision for abuse of discretion, applying an arbitrary and capricious standard. *See Firestone,* 489 U.S. at 115; *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003). Notwithstanding the grant of discretionary authority, however, the less deferential *de novo* review will be still be appropriate if the plaintiff can demonstrate that "the administrator was *in fact* influenced by [a] conflict of interest." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (quoting *Sullivan,* 82 F.3d at 1256).

In this case, both parties agree that UNUM had discretionary authority to interpret the plan and deny benefits. *See* AR 73 ("When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy"). Although plaintiff in her brief suggested that UNUM had an inherent conflict of interest resulting from its dual role as plan administrator and as a profit-making business, thus warranting *de novo* review, plaintiff acknowledged at oral argument that she had not carried her burden of showing that a conflict of interest "in fact" affected UNUM's decision to deny her long-term benefits. In the Second Circuit, the mere "fact that UNUM

served as both plan administrator and plan insurer, although a factor to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review." *Pulvers*, 210 F.3d at 92 (internal quotation marks and citation omitted); *see also Whitney v. Empire Blue Cross & Blue Shield*, 106 F.3d 475, 476-77 (2d Cir. 1997).

Therefore, as plaintiff rightly conceded at argument, this Court must apply the arbitrary and capricious standard in reviewing UNUM's decision to deny her long-term disability benefits. Judicial review of a plan administrator's decision under the arbitrary and capricious standard is narrow. *See Celardo*, 318 F.3d at 146; *Peterson v. Cont'l Cas. Co.*, 52 F.3d 438, 442 (2d Cir. 2003). A denial of benefits may be overturned as arbitrary and capricious "only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir. 1999) (citation and internal quotation marks omitted); *see also Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Celardo*, 318 F.3d at 146 (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). A district court is not free to substitute its own judgment for that of the plan administrator as if the court were considering the issue of eligibility anew. *Pagan*, 52 F.3d at 442; *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The Court may not upset a reasonable interpretation by the administrator.") Moreover, a court's review under the arbitrary and capricious standard is limited to the administrative record. *Miller*, 72 F.3d at 1071. Finally, plaintiff has the burden of

demonstrating that UNUM's denial of benefits was arbitrary and capricious. *See Sharkey v. Ultramar Energy ltd.,* 70 F.3d 220, 230 (2d Cir. 1995).

III.

Plaintiff contends that UNUM's decision is arbitrary and capricious for five reasons: (1) UNUM improperly credited the assessments of its medical consultants, who never examined plaintiff, over the December 2001 judgment of Dr. Levin, plaintiff's treating physician, that plaintiff was not able to perform full-time sedentary work because of her fibromyalgia; (2) UNUM arbitrarily rejected Dr. Levin's judgment without conducting an independent medical examination of plaintiff; (3) UNUM erroneously concluded, contrary to medical literature, that Dr. Levin was wrong in his assessment that plaintiff's fibromyalgia prevented her from performing full-time sedentary work; (4) UNUM failed to consider plaintiff's own complaints of symptoms resulting from the fibromyalgia, which are inconsistent with UNUM's determination of full-time sedentary work capacity; and (5) UNUM misconstrued the facts regarding her volunteer work for her church.  While the Court is sympathetic to plaintiff's plight, the Court concludes that none of plaintiff's arguments establishes that UNUM's decision to deny her long-term disability benefits was without reason, was unsupported by substantial evidence or was erroneous as a matter of law.

A.

The first three of plaintiff's asserted grounds for challenging UNUM's decision are related in that they all seek in different ways to demonstrate that UNUM had no proper grounds for rejecting Dr. Levin's December 2001 assertion that plaintiff was limited to no more than 2 hours of sedentary work followed by 1 hour of rest.  Plaintiff's invocation of medical literature (ground

# 3 above) can be disposed of summarily. Plaintiff's counsel acknowledged at oral argument that plaintiff had not submitted any medical literature to UNUM in connection with plaintiff's claim. As a consequence, there is no medical literature in the record that disputes UNUM's view that an individual suffering from fibromyalgia can perform full-time sedentary work. UNUM can hardly be faulted for reaching a conclusion that is contrary to medical literature when neither UNUM nor this Court has been presented with *any* medical literature, much less medical literature that affirmatively contradicts UNUM's determination.

As to plaintiff's argument that UNUM should have accorded greater deference to the views of Dr. Levin, her treating physician, than to the conclusions of UNUM's medical consultants, the Supreme Court recently emphasized that "[n]othing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker v. Nord*, 123 S.Ct. 1965, 1970 (2003). "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 1972.

Thus, UNUM was under no obligation to credit the views of plaintiff's treating physicians over those of UNUM's own medical consultants. However, this is not a case in which a plan administrator refused to credit the views of a claimant's treating physicians. To the contrary, UNUM relied heavily on the numerous medical reports that plaintiff's treating physicians had

submitted or prepared over an approximately three-year period. *See Maniatty v. UNUMProvident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002). Those reports, primarily from Dr. Levin but also from Dr. Tolsdorf, showed definitively that the mental impairments and deficiencies from plaintiff's lupus that had caused the original determination of her disability had largely resolved themselves by the fall of 2001. What UNUM declined to credit was Dr. Levin's December 2001 assessment that Plaintiff was no longer capable of full-time sedentary work capacity because of her fibromyalgia.

UNUM was, from the Court's perspective, properly skeptical of what it perceived as an unjustified about-face by Dr. Levin following UNUM's November 2001 denial of benefits. All of the medical information in Plaintiff's record showed that she had made considerable improvement in the period 1999-2001. Indeed, as of January 2001, Dr. Levin had concluded that she could perform 8 hours of work, including three hours of light and one hour of medium work, far more physically demanding than the sedentary work that she had previously performed at A&T. There was not a hint in that report that fibromyalgia would prevent her from performing sedentary work. Later in 2001 Dr. Tolsdorf concluded that the mental confusion and impairment from lupus that had so interfered with plaintiff's performance of her sedentary duties at A&T had now been resolved and that plaintiff's neurological condition had returned to "normal levels." Finally, in late September 2001, Dr. Levin reported that plaintiff's lupus had been resolved and that plaintiff was now capable of full-time sedentary work. It was not until *after* UNUM had denied plaintiff continued disability benefits that Dr. Levin abruptly and dramatically changed his view. Yet, he failed to indicate what possibly could have occurred during the short span of two months that would justify such a drastic change in assessment – other than, of course, UNUM's

November 2001 letter denying plaintiff disability benefits.

Therefore, in concluding that plaintiff was no longer disabled within the meaning of its long-term disability policy, UNUM had ample basis for according greater weight to the assessments of its own reviewing physicians along with those of Drs. Tolsdorf, Carr, Gendron, Delay and the pre-December 2001 reports submitted by Dr. Levin, than to Dr. Levin's December 2001 opinion.[4]

Plaintiff also argues that UNUM acted arbitrarily in deciding her claim without obtaining an independent medical examination of plaintiff. In effect, plaintiff argues that if UNUM was of the view that Dr. Levin's December 2001 assessment was unpersuasive, UNUM should then have obtained an independent medical examination from another rheumatologist. Certainly, an independent medical examination would have been helpful. However, that is not the issue before the Court. Rather, the question is whether UNUM had sufficient evidence in the medical record to support its determination without an independent medical examination, and the Court concludes that in the circumstances of this case, UNUM did. Plaintiff's medical file contains an abundance of information regarding her condition and its progress over three years. Moreover, UNUM had several physicians, a physical therapist and a vocational consultant all conduct

---

[4] It is noteworthy that Dr. Caryn Nesbitt's records, submitted with the March 2002 request for an additional review of UNUM's denial of benefits, indicate that plaintiff had long been exhibiting symptoms associated with fibromyalgia. Dr. Nesbitt observed in October 1998 "[s]ymptoms suggestive of depression and muscle aches suggestive of fibromyalgia." AR 179. Again in February 2000 Dr. Nesbitt noted that "the patient's sleep order may be intimately tied into her muscle aches as is seen in fibromyalgia." AR 192. These reports suggest that plaintiff's fibromyalgia was not a newly developed condition, but rather had existed well before 2001. Nonetheless, Dr. Levin concluded in 2000 and 2001 that plaintiff's overall condition had sufficiently improved to recommend resumption of at least sedentary work and by early 2001, he believed that plaintiff also had the ability to perform medium capacity work.

several complete medical reviews of plaintiff's file before finally rejecting her claim. Their conclusions were all unanimous and were supported by Dr. Levin's pre-December 2001 assessments as well as by the results of Dr. Tolsdorf's examination.

Furthermore, UNUM is neither required by law nor by the terms of its own policy to order independent medical examinations of claimants before denying them benefits.[5] "Because the plan does not require an independent medical examination, it is not *per se* unreasonable . . . to deny the plaintiff benefits without requesting an independent medical examination, in light of . . . file review by two independent medical examiners." *Kocsis*, 142 F.Supp.2d at 254-55. In this regard, it is important to note that it was plaintiff who had the burden of demonstrating her disability.[6] Where it is incumbent upon the claimant to provide medical evidence to support her eligibility for benefits, the plan administrator is justified in denying benefits when the claimant fails to present proof of her disability. *See Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 46 (3d Cir. 1993). *See also Piscottano v. Metropolitan Life Ins. Co.*, 118 F.Supp.2d 200, 216 (D.Conn. 2000) ("[claimant] was reasonably required by [the provider] to come forward with information supporting her claim of total disability, and her inexplicable failure to do so was a

---

[5]The policy states that UNUM "*may* require you to be examined by a doctor, other medical practitioner or vocational expert of our choice." AR 90 (emphasis added) Since the word "may" confers upon the administrator discretion in determining whether to refer a claimant for additional medical examination, UNUM was not under an affirmative legal duty to obtain an independent medical examination before deciding whether to grant or deny benefits. *See Kocsis*, 142 F. Supp. 2d at 241, 254-55 (D.Conn. 2001).

[6]The May 3, 1999 letter informing plaintiff that her request for long-term disability benefits had been approved indicated that "in order to qualify for ongoing benefits, you must continue to meet the definition of disability in your contract. UNUM may request that you provide additional medical and/or vocational information on a periodic basis to support your claim for disability benefits." AR 674.

reasonable grounds for termination."). UNUM was therefore not required to disprove plaintiff's claim of disability by, for example, obtaining an independent medical examination. In sum, the Court does not believe that UNUM acted arbitrarily or capriciously in failing to obtain an independent medical examination of plaintiff.

B.

Plaintiff's other two challenges to UNUM's decision relate to information she provided UNUM. First, she complains that UNUM misconstrued her statements about her work with her church. In particular, plaintiff does not believe that her volunteer work undercut her claim that she was incapable of working full-time since that work was not full time; moreover, plaintiff's volunteer work allowed her ample time to rest when she became fatigued, rest time that she would not have in a full-time work environment. At argument, plaintiff's counsel acknowledged that UNUM did not refuse to consider any of the information plaintiff submitted about the nature of her church work. Thus, UNUM had before it all of the facts regarding her volunteer work. Furthermore, the record shows that UNUM principally based its decision on the medical record and assessments of physicians and a vocational consultant; UNUM's decision did not turn on plaintiff's statements regarding her volunteer work. The Court, therefore, rejects plaintiff's argument that UNUM's decision is arbitrary and capricious because it is based on any misunderstanding about the actual facts regarding plaintiff's volunteer work at her church.

Finally, plaintiff argues that UNUM acted arbitrarily and capriciously in failing properly to consider plaintiff's own complaints of symptoms relating to fibromyalgia. Plan administrators have a duty to take relevant evidence into consideration when making a disability determination, and an applicant's subjective reports would constitute relevant evidence. *See Connors v. Conn.*

17

*Gen. Life Ins. Co.*, 272 F.3d 127, 136 ("It has long been the law of this Circuit that the subjective element of pain is an important factor to be considered in determining disability.")(internal quotations and citation omitted).  However, there is no indication that UNUM refused to consider plaintiff's subjective complaints.  Rather, the record is clear that UNUM ultimately opted to credit the reports of physicians who had examined plaintiff during several years and the views of physicians who had examined her medical record, over plaintiff's post-denial of benefits subjective statements as to her work capacity.

  Moreover, it is not unreasonable for a plan administrator to demand some objective evidence to support the existence and nature of a claimed medical condition.  While a plaintiff's self-reported symptoms and subjective reports are relevant in considering whether to grant benefits – and there is no reason to believe that UNUM failed to consider plaintiff's subjective reports regarding those symptoms – plan administrators are not obligated to accord special weight to those subjective reports standing alone.  In that regard, the Court finds persuasive the analysis set forth in *Maniatty*, *supra*, which considered a similar argument regarding an plan administrator's alleged failure to credit a claimant's subjective complaints in the absence of objective evidence to support them.  There, the Court explained, "[I]t was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnosis was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator. . . [T]he plan does state that 'proof' of continued disability must be provided . . . , and the very concept of proof connotes objectivity.  In any event, it is hardly unreasonable for the administrator to require an objective component to such proof."  218 F. Supp. 2d at 504.  Here,

too, it was not unreasonable for UNUM in reaching its decision to place greater weight on the history of plaintiff's medical conditions and the reports of numerous physicians, including her treating physicians, than on plaintiff's own subjective complaints following her loss of disability benefits.

IV.

In sum, the record shows that as a result of several comprehensive and considered reviews of plaintiff's medical records and the opinions and reports of plaintiff's physicians, UNUM concluded on the basis of standards set forth in the policy that plaintiff was no longer disabled.  Understandably, plaintiff disagrees with that determination.  However, the fact that plaintiff reaches a different conclusion from the record than UNUM does not necessarily establish that UNUM acted contrary to law or otherwise arbitrarily or capriciously in arriving at its decision to discontinue plaintiff's benefits.  After a thorough review of the administrative record, this Court is satisfied that UNUM's decision is not contrary to law or otherwise unreasonable and that it is supported by substantial evidence in the record.

For the reasons stated, therefore, UNUM's Motion for Summary Judgment [doc. #19] is GRANTED, and plaintiff's Motion for Summary Judgment [doc. #14] is DENIED.  The Clerk is directed to enter judgment for the defendant on the plaintiff's claim and close the case.

IT IS SO ORDERED.

/s/      Mark R. Kravitz
              U.S.D.J.

Dated in New Haven, Connecticut: December 3, 2003.